STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JOHN R. LONGO, PLAINTIFF IN ERROR.

Submitted September 15, 1944—Decided March 1, 1945.

Before BROGAN, CHIEF JUSTICE, and Justices DONGES and PERSKIE.

For the plaintiff in error, *Raymond Chasan.*

For the defendant in error, *William George* and *Frank G. Schlosser.*

The opinion of the court was delivered by

DONGES, J. Plaintiff in error was convicted of crime in the Hudson County Court of Quarter Sessions and by this

writ of error seeks a review of that conviction. The criminal conduct charged against him is that he and another, being employees of the Commissioner of Registration and Superintendent of Elections of Hudson County, caused certain voting records pertaining to primary election votes cast by the plaintiff in error, which records were lodged in the office of the Commissioner of Registration, to be altered. The other accused admitted his part in the occurrence. The state contended at the trial that the voting record of Longo for the primary election of 1941 had been marked "Rep," indicating the casting of a vote in the Republican party primary and that Longo and his associate had altered this to "Dem," to indicate voting in the Democratic Primary, because the record of having cast a Republican ballot might be embarrassing to plaintiff in error in his attempt to seek appointment to a certain public office which might normally be expected to go to a Democrat. Subsequently, according to the evidence produced by the state, a superior officer, learning of what had occurred, changed the record back to "Rep." In any event it is apparent from the testimony and the exhibits that an erasure in the voting record was in fact made.

The conduct alleged by the state to be criminal is made the basis of three counts in the indictment. Apparently the first count charges a violation of *R. S.* 19:34–1, the second count also charges a violation of *R. S.* 19:34–1, and the third count is worded so as to charge a violation of *R. S.* 2:132–1.

The first point urged by the plaintiff in error is that the judgment of conviction should be reversed because the indictment upon which it is based, and each count thereof, fails to charge a crime. This contention was first made in the court below on the motion in arrest of judgment following the finding of guilty by the jury. There was no motion made to quash the indictment, so the plaintiff in error can prevail upon his present contention only if the indictment charges no crime at all in any of its counts. It makes no difference if the indictment is so worded that one or two counts would or should have been stricken upon a motion to quash. The verdict and judgment of guilty being a general one the conviction must be sustained if any of the counts sufficiently

charges an offense. As was said by Chancellor Walker, speaking for the Court of Errors and Appeals, in *State* v. *Huggins*, 84 *N. J. L.* 254:

"Where there are several counts in an indictment, each charging a distinct crime, a general verdict of guilty amounts to a conviction of each separate offense, and even if the verdict cannot be supported as to one or more of the crimes charged, it would be an anomaly and a grave defect of criminal justice, if an entire reversal were necessitated, because, while conviction on one or more of the counts was legal, there nevertheless had to be a reversal on another or other counts. Such a conviction will be upheld if there be a good count describing the offense."

We deem it unnecessary to consider, therefore, whether or not the first and second counts sufficiently charge a violation of the statute or whether the proofs would sustain a conviction thereunder, because we are of the opinion that the third count clearly charges a criminal offense and further that there was evidence adduced in support of such charge. This count charged that the defendants, on or about January 20th, 1942, "with intent to prejudice some other person or persons to the Grand Inquest unknown, did unlawfully and falsely alter, forge and counterfeit divers records and other authentic matter of a public nature, &c."

The statute, *R. S.* 2:132–1, declares to be guilty of a misdemeanor, "Any person who, with intent to prejudice, injure, damage or defraud any other person shall:

"a. Falsely make, alter, forge or counterfeit, or cause, counsel, hire, command or procure to be falsely made, altered, forged or counterfeited, or willingly act or assist in the false making, altering, forging or counterfeiting

"1. Any record or other authentic matter of a public nature, character, letters patent, deed, lease, writing sealed, will, testament, annuity, bond, bill, writing obligatory, bank bill or note, United States treasury note, check, draft, bill of exchange, or promissory note for the payment of money, or * * *."

The contention of the plaintiff in error is that the indictment is defective because it alleges the alteration of a voting

record, an instrument wholly incapable of supporting a civil suit or defeating the civil suit of another, to his financial damage, injury or prejudice. It is argued that the statute above quoted denounces only crimes involving private injury to property by fraud.

The indictment charges, in the language of the statute, that the act was committed with intent to prejudice. It was held by the Court of Errors and Appeals in *Rohr* v. *State*, 60 *N. J. L.* 576, that under our statute "it is no longer necessary, in cases of forgery, &c., to allege in the indictment the name of the person intended to be defrauded, nor, on the trial, to prove an intent on the part of the defendant to defraud any particular person; it is sufficient to allege and prove that the defendant did the act charged with an intent to defraud." We think an intent to prejudice is clearly inferable from the factual situation presented in this case. The legislature has, by the election laws, provided for the office of Commissioner of Registration and has provided that the record of votes cast by citizens in primary elections be kept, an incident of which is a notation of the party ballot voted by each such voter. It is the established public policy that such record be kept and that it be kept honestly and accurately. The altering or falsification of such a record is at least prejudicial to and a fraud upon the state. The "person" defrauded, within the meaning of forgery statutes, can be a state, county or other governmental unit. 26 *C. J.* 905.

It is not necessary to sustain a conviction for forgery, where the forgery is committed upon a public record, that the subject of the forgery should be an instrument upon which a civil suit could be based. Public records are necessarily and essentially different from such instruments as notes, checks, receipts, &c., used in private commercial business. If it be so, as argued by plaintiff in error, that there must be intent to inflict financial damage upon a person in the alteration of a commercial instrument, we do not consider that such rule applies to the alteration of a record or other authentic matter of a public nature. The crime of forgery, at common law, originally applied only to public

records and was later extended to private documents and instruments. *State* v. *Redstrake,* 39 *N. J. L.* 365.

We conclude that the indictment sufficiently charged a violation of the cited statute and that the factual situation was such as to warrant the conclusion that the defendant acted with fraudulent intent when he participated in the act of which the jury has found him guilty.

The second point made by the plaintiff in error is that the conviction should be set aside because it was procured by suppression of evidence competent and material to prove the innocence of the defendant, in the possession of the state at the time of trial and available for presentation to the jury. This contention was made to the trial judge on an application for a new trial after the conviction, the plaintiff in error not having participated in the trial under circumstances which will be more fully outlined hereafter.

As stated above, the contention of the state was that the plaintiff in error and one Grundy altered the voting records in the office of the Commissioner of Registration. This was done in two places, on the white or original record and on the buff or duplicate record. The evidence on behalf of the state, there being none on behalf of the defendant, was to the effect that two fellow employees in the office observed Grundy and Longo doing something about the records. After Grundy and Longo left the immediate vicinity, these fellow employees looked at the records and found them damp and rough as from the use of ink eradicator and that the letters "Dem" appeared thereon. This incident occurred in the latter part of January, 1942, and these employees made no report thereof to their superiors.

In March, 1942, another employee in the office in making a check of the records came upon the record of Longo and observed what he thought was evidence of tampering and alteration. At that time, according to him and other witnesses, the letters "Dem" appeared on the white and buff sheets. He reported this to his superiors and an examination was made of the poll book, the third record kept of the vote cast, and it was found that it indicated a Republican and not a Democrat ballot had been cast by Longo in the 1941 primary election.

The chief clerk of the office thereupon, by the use of ink eradicator, removed the letters "Dem" and replaced them with "Rep" on the white and buff copies in order to make them correspond to the poll book which he took to be the accurate record. The various employees in the office of the Commissioner of Registration testified to these facts and Grundy, who also testified at the trial below, admitted his part in the matter, he having entered a plea of guilty to the indictment.

Apparently in an effort to substantiate the direct evidence available as to what occurred, the prosecutor of the pleas caused an examination of the records to be made, in February, 1943, by an expert in such matters, one August Hartkorn. It is his examination and the written report thereof that he made to the prosecutor (referred to in the briefs as the Hartkorn Report) that constitute the evidence which the plaintiff in error now alleges was unlawfully suppressed by the state. Hartkorn reported that by means of the tests he used he was able under the microscope to detect two layers of writing and rubber stamping in both of which the letters "Rep" appeared. The inference to be drawn from his report is that he did not detect by his test the presence of the letters "Dem." The plaintiff in error contends, in effect, that this is conclusive evidence of his innocence and disproof of all the state's testimony to the effect that the letters "Dem" had appeared upon the records. Although we think it cannot have that effect, it being merely negative evidence, the case does not turn upon that question. The report substantiated the state's contention that alterations of the records had been made but did not go so far as the state contended as to what the alteration had been.

Plaintiff in error contended upon the application for a new trial and now contends in this court that neither he nor his counsel had knowledge of this report of Hartkorn and the substance thereof until after the convictions. Questions being raised at the argument which involved matters of fact not within the record, the court allowed a writ of *certiorari* designed to present the entire situation and directed the taking of depositions limited to proofs as to "whether the facts of

the so-called Hartkorn report, in the possession of the state, were suppressed, or whether the existence of the report and its contents were not known to the plaintiff in error and his counsel, Mr. Chasan, before the trial of the defendant upon the indictment was moved."

These depositions are now before us and do not justify a finding that there was a concealment of the evidence in question. Jacob J. Levey, a member of the bar and counsel of the Superintendent of Elections, was present at the Hartkorn examination as a representative of the superintendent. His deposition describes the test and the result thereof as depicted in the photographs. He testified that shortly after the test was made he had a conversation with plaintiff in error and Murray Greiman, whom Levey described as Longo's then counsel. He recounts, "I told Mr. Greiman and Mr. Longo that I had attended an examination at which his voting record was examined by August Hartkorn, who was a handwriting expert, and I explained to him the process as it had been demonstrated in front of me, as well as yourself and Judge O'Regan, by Mr. Hartkorn, and I told them that when Mr. Hartkorn was finished with his examination that he had asked you to look at it and asked me to look at the voting record, and that I looked through this instrument, which I since learned is called a stereoptic microscope, and in that instrument I could see the word "Rep" superimposed over the word "Rep," and I also explained to them  *  *  *  Longo and Greiman together, that Mr. Hartkorn said that he had been in cases where they had reproduced many handwritings, one superimposed over the other, that this process served to restore them, and that you would see them, looking through a microscope as he had there, that he would see them in layers, and that is the word I used to them, and to make the thing more clear, I had some law books which I had been reading at the time on my desk, and I demonstrated by laying the books one on top of the other." He further advised them to employ a handwriting expert in the event of Longo's indictment, this incident having occurred before the date of the indictment.

Plaintiff in error himself testified in his deposition to such a conversation, fixing the time as early March, 1943. The

trial below took place November 15th, 1943. Longo said, speaking of Levey, "* * * he said, 'I looked through that and I just saw "Rep" and superimposed another "Rep," ' and then he said Mr. George had turned to the expert present and said, 'Are you sure you can't see a "Dem" there?' and the expert said, 'If it was there, I would find it.' Then he began telling me a story about this expert describing what the instrument was, that you could look through seven layers of writing, and if there had been seven different writings, you could find each, and then he became very vague."

Simon Fisch, a practicing lawyer, testified that he was approached a week before plaintiff in error's trial by Mr. Chasan, now counsel to Longo, and asked to act as trial counsel. They conferred and, Fisch being uncertain about acceptance, Chasan left some memoranda with him for perusal. Upon his declination of the retainer he returned the papers to Chasan. Fisch testified, "My recollection is that the summary contained the information that the prosecutor had had the election, the pollbooks, examined by a handwriting expert, and that the expert's result of this examination showed that 'Rep' had been erased and a 'Rep' substituted, and my recollection is that I did discuss that phase with Mr. Chasan, he pointed out to me that, under those circumstances, how possibly could the prosecutor say that there had been a 'Dem' there, when the handwriting expert had come to the conclusion that there was a 'Rep' erased and a 'Rep' substituted."

A reading of the depositions leads us to the conclusion that there was in fact no suppression of evidence by the state and that the plaintiff in error had ample information to prompt him to pursue the particular line of inquiry either by seeking the expert in question or obtaining expert opinions from others in that field. There was no infringement of his rights in anything that occurred.

We are not to be considered as expressing the view that it is the duty of the prosecutor of the pleas to volunteer to a defendant the result of every line of inquiry that does not support the state's theory of a criminal prosecution, but are merely holding that the factual situation in this case discloses nothing concerning which the plaintiff in error has any just complaint.

Furthermore, the question was raised upon an application to the trial court for a new trial. Such applications rest in the sound discretion of the court. *In re Longo,* 124 *N. J. L.* 176, *certiorari* denied, 83 *L. Ed.* 424. As the trial court observed in dealing with the application, the plaintiff in error relied upon, as against the sworn testimony of six witnesses, giving direct testimony, one of them an actual participant in the transaction, only the opinion of one man based upon the result of an experiment he conducted. We conclude there was no abuse of discretion in the action taken by the trial judge in denying a new trial.

The third point is that the trial court erred in moving the indictment without affording plaintiff in error reasonable opportunity to procure the assistance of counsel, and that the trial of the defendant without the assistance of counsel was a violation of his rights under both the federal and state constitutions. A consideration of this contention requires a review of the things that transpired between the indictment of plaintiff in error on April 20th, 1943, and his trial almost seven months later on November 15th.

The plaintiff in error was arraigned, entered a plea of not guilty and was released in bail on April 29th, 1943. At that appearance he was represented by Raymond Chasan, counsel who represents him upon the present writ of error.

On June 1st, 1943, the parties were once more before the court and Mr. Chasan, again representing plaintiff in error, moved for the postponement of the trial until the next term of court, stating, "I shall be pleased to undertake to have this case ready for trial in the September term." On this occasion Mr. Chasan stated that he did not intend to conduct the trial personally but proposed to secure associate counsel. The state objected to a postponement until the next term and the court set the date of June 8th for the trial.

The next appearance of counsel before the court was on June 9th, 1943, at which time the assistant prosecutor of the pleas attempted to move the trial. Mr. Chasan, again appearing for the plaintiff in error, protested that the defense was not ready and sought a further adjournment. He stated that there had been a death in the family of plaintiff in error and

that associate counsel had not yet been retained. He further stated that defendant, who was not in court, was in a hospital for the purpose of undergoing an operation. It was subsequently developed that the condition which prompted his hospitalization was not an acute one of recent origin but a long standing foot deformity which required correction by surgery. Comment is made, not without some pertinency, upon the time selected for medical treatment of this condition. After some discussion on this occasion the court adjourned the trial to June 14th, 1943, and ordered bail forfeited.

On that date the state again moved the trial. Mr. Chasan stated the inability of the defense to proceed because the defendant was still confined to the hospital and expected to be there for three weeks more.

The following day, June 15th, counsel again appeared before the court and as a result of the representations and denials made to the court as to the physical condition of the defendant, the court designated a physician to make an examination of the defendant for the purpose of determining whether or not the defendant could appear for trial by the 1st of July. The physician reported back to the court later in the day and also on the following day, the 16th, and finally the court continued the matter until June 25th. On that day the motion for continuance to the September term was granted, and on July 7th the defendant appeared in court, the forfeiture of bail was vacated and new bail given. The court then informed counsel that on the opening day of the September term a date for trial would be fixed.

According to the entries in the docket of the clerk, on September 21st, 1943, the matter of setting a trial date was postponed at the request of defense counsel, and on October 8th, in the presence of Mr. Chasan and the assistant prosecutor, the date of November 15th was fixed. We have not been furnished with a stenographic transcript of what occurred on these two occasions.

On November 15th, the defendant appearing, the state once more sought to move the indictment for trial. Mr. Chasan was again in court and stated that at noon on the preceding Saturday (the 15th being Monday) he had secured the ser-

vices of Mr. Julius Lichtenstein to act as trial counsel. Mr. Chasan again moved for a postponement. Mr. Lichtenstein was not in court but was summoned and represented to the court that he knew nothing of the facts of the case other than what Mr. Chasan had told him; that he had agreed to act as trial counsel if the matter could be adjourned; and that in view of his engagements he would need two weeks to prepare. The assistant prosecutor opposed any further postponement on the ground that there was a likelihood that some of the state's witnesses would leave the jurisdiction and no longer be available to give their testimony. The court denied the motion for continuance. Mr. Lichtenstein and Mr. Chasan declined to represent the defendant although the court asked them so to do and attempted to appoint them to act as counsel at the trial, to which they objected on the ground that the court was without power to appoint counsel unless the defendant was impecunious, which was not so in this case. The trial proceeded with the defendant refusing to participate. He did not cross-examine the witnesses for the state, nor did he offer any testimony in his own defense.

Four days after the trial, when the state moved for sentence, the defendant was represented by Mr. Lichtenstein and Mr. Chasan. They prosecuted on his behalf a motion in arrest of judgment and an application for a new trial, and Mr. Chasan represents him on the argument of this writ of error. It would appear, therefore, that the defendant was represented by counsel from the time of his indictment down to the day of trial and has been represented since the trial down to the present time. He was without counsel at the trial due to Mr. Lichtenstein's inability to participate, due to previous engagements for that day, and due to Mr. Chasan's refusal to act for what he termed personal reasons.

Under the circumstances above outlined, can it be said that the plaintiff in error was denied counsel or was denied a reasonable opportunity to procure the assistance of counsel? We think not. The constitutional guarantee of the right to representation by counsel does not mean that an accused may avoid trial by neglecting or refusing to secure the assistance of counsel and by refusing to participate in his trial.

Plaintiff in error invokes the Fourteenth Amendment to the Constitution of the United States, but the United States Supreme Court has said, in *Betts* v. *Brady*, 316 *U. S.* 465, that "we cannot say that the amendment embodies an inexorable command that no trial for any offense, or in any court, can be fairly conducted and justice accorded a defendant who is not represented by counsel."

The same court said in *Johnson* v. *Zerbet*, 304 *U. S.* 458, that the right to counsel may be waived and that, "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused."

Consider these features in the instant case. The defendant is not represented to us as an ignorant man. His counsel stated in one of his arguments to the trial court that he was a man who had held high public office. He had the experience of a trial and conviction previously. He, therefore, knew the function of counsel. He was indicted in April, 1943, about seven months before the trial. Immediately upon his indictment he engaged counsel who apparently consulted with him and appeared in court in his behalf many times over a period of several months. He knew of the state's desire to move the indictment for trial but pursued a course of conduct designed to secure delay and postpone a trial, finally succeeding in having it put off until the September term of court. The day on which the court finally required the trial to proceed was two months after the opening of the September term. It is said that during the intervening time efforts were being made to secure associate counsel and that several members of the bar were approached on the subject. It would certainly seem that between June 1st, when Mr. Chasan said in court, in the presence of the defendant, that he intended to secure other counsel to conduct the trial, and November 15th, that there was ample time to engage counsel and that the defendant was afforded more than a reasonable opportunity to secure the assistance of counsel. At no time did he ask the court to designate counsel. His position was that he intended to get counsel but that he had not yet done it. It did not lie

within his power to defeat the ends of justice and avoid a trial by simply refraining from exercising what he deemed to be his constitutional rights.

This court said in *State* v. *Raney*, 63 *N. J. L.* 363, "The only question raised by such an exception is whether a criminal court commits error by proceeding to try an accused person without counsel. If so, it is obvious that counsel must be assigned to every accused, although he is of ability to procure counsel but neglects or refuses to do so, or prefers to defend himself without the assistance of counsel. This argument is novel and ignores the common practice of criminal courts to assign counsel to the accused only when they are unable to procure counsel by reason of poverty and when they ask for the assistance of counsel, a practice regulated by the supplement to the Criminal Procedure Act, approved May 17th, 1894. *Gen Stat., p.* 1154.

"The argument is based upon the last clause of the eighth section of article 1 of our constitution which guarantees to the accused in all criminal prosecutions the right 'to have the assistance of counsel in his defense.' This section confers upon accused persons rights and privileges for his benefit and it is settled in this court that an accused may waive and renounce the provision made for his benefit. *Edwards* v. *State*, 16 *Vr.* 419. The right and privilege in question in this case is thus capable of being waived. In the absence in the record and proceedings of any indication that the accused desired the assistance of counsel and was denied it, it will be presumed that he failed to ask that counsel be assigned for his defense, and chose to defend himself. The right and privilege is not denied by mere failure to assign counsel."

We think a recital of the events that took place between the time of the indictment and the day of the trial indicates that the defendant abandoned or waived any right or privilege with respect to representation by counsel that he might have had, by his refusal or neglect to procure such counsel. His whole course of conduct indicates nothing but a desire to secure delay. He received at the hands of the trial court all, if not more, of the consideration and indulgence with respect to fixing the trial date that he was entitled to. On November

15th, 1943, he was in no position to insist as a matter of right upon further delay, and thus flout the court and the constituted authorities in the effort to administer the criminal law. We think there was no error in denying the further postponement.

The judgment is affirmed, with costs.